And then we'll go to our next case, United States v. Segal, Mr. Joyce. May it please the Court, Mr. Segal. We're here on three related appeals, all of which grow out of the resolution of a $15 million forfeiture assessed against Mike Segal personally. Segal was the owner and operator of one of the largest, if not the largest, insurance brokerages in the United States. It was forfeited to the government shortly after Mr. Segal received an offer, a cash offer, to purchase for $150 million. Segal was sentenced to serve 121 months in prison. At the time of the sentencing, the trial court found no one was a victim of Segal's misuse of the insurance brokerage premium fund trust account. No insurance company or any insurer or insured. While Segal was in prison, the United States in Skilman v. I'm sorry, the Supreme Court in Skilman v. United States concluded that one of the principal offenses that resulted in Segal's incarceration did not state a federal crime, especially under the circumstances relating to Mr. Segal. Another element of the conviction related to criminal tax fraud. When Segal was released from prison, he pro se filed a tax court case, fought the tax court case, and the tax court concluded that there were no deficiencies due in the income tax and that there were no fraud penalties to be assessed. So after Segal was released from prison, the only money he had was a Social Security payment, part of which was going to the government to pay restitution. In order to secure the government's forfeiture rights, injunctions and restraining orders were in place against all of the assets Segal had or might have. This resulted in Segal not being able to access any of assets. The district court ordered a two-step process to resolve Segal's forfeiture obligations. The first step was to have a hearing on who owned the restrained assets. The second part was to have a hearing to determine the value of those assets. Before those hearings were set to commence, the parties on February Segal's forfeiture obligations. As a result of the settlement, Segal was to receive $2,150,000 in cash. He also received two options which were exercisable until August 13, 2013. One option gave him the right to acquire some insurance policies on his life. The second option gave him the right to repurchase from the government an interest in three Chicago Bulls that Segal had assigned to the government to pay part of the $15 million forfeiture. Before Segal could decide which of the insurance options or insurance policies, if any, to purchase, he needed information about, for example, who owned the policy. Was this a policy the government owned, your north owned, or someone else owned? He also needed to know whether any liens against the policy or any contractual problems that affected value. Segal contacted the insurance companies if they would not respond to any of his questions or give many information because of the injunction and restraining orders that were still in place. Segal then asked the government to authorize his contact and to sign a letter to the insurance companies authorizing that aspect of what he needed. We believe that paragraph 19 of the settlement agreement required the parties to cooperate in the implementation of the settlement agreement, including specifically the necessary to help dispose of property. Mr. Joyce, the settlement agreement provides specifically for an exchange of information about cash value, but about nothing else, correct? You're right, that's specifically dealt with, but nothing else. So, nevertheless, when we look at Judge Castillo's decision here on the insurance policy question, are we looking at, in essence, his review of factual disputes between the parties about this long back-and-forth concerning who is going to write what letters to whom when? No, I think we're looking at Judge Castillo's review of the settlement stipulation in the full sense of the word, all the paragraphs. I think it's significant that on July 19, 2013, the government finally agreed to send the Segal requested. In the letter it says, quote, in order to facilitate the liquidation and or transfer process of these policies, the government and Mr. Segal need information relating to these policies, including but not limited to the premium cash surrender value, the death benefit of the policy, an annual cost of the policy to assess future value of the policy. So the government belatedly and reluctantly acknowledged that both they and Segal need the information. Of course, they didn't ask for it until about a week or two before the expiration date on his option to acquire. One of the carriers gave the information within days of August 13th, the drop-dead date on the exercise of the option. The other carrier gave it weeks later. Did Mr. Segal exercise the option on the policies for which he had the information? No, he did not for a second reason. Mr. Segal was entitled to get, as I said, $2,150,000 in cash. The settlement stipulation provided that he would get that cash when the court accepted the settlement. The court accepted the settlement on February 13th, 2013. The first cash Segal ever saw was two months later, it was $550,000. So not knowing that would be the last cash he'd ever see until long after the option dates, he paid some bills including bills to his attorneys who had not been paid in 10 years. So Segal went in before the district court before the option expired and asked for more time to deal with these issues because he didn't get the information he needed and secondly, he didn't have the cash he was considering the totality of events and all the provisions in the settlement stipulation focused on the fact that there's no place in the settlement stipulation that said if the government doesn't pay you and you haven't got the cash and you haven't got the information, you still must exercise the option. To me it was a rather unreasonable interpretation of a written settlement agreement. Now we've laid out in our brief and I'll quickly go through it, the first cash is released on April 13th, 2013. That left a million six to be released. The government then held back $841,000 to pay a restitution that had been levied against Segal and Near North jointly 10 years before. Near North had the cash to pay and should have paid but didn't. Justice Steele concluded that Segal only had to pay $324,000 of that money and consequently $526,000 of the restraint. I'm losing the thread of your argument. With regard to the insurance policies, the settlement stipulation says that he had until Segal had until August 13, 2013 to exercise the option to obtain the insurance policy. Correct. And he didn't make that date. Well, I think the facts that the district court didn't focus on or accept was Segal started to ask for information from the insurance carriers within weeks of signing the to assist in that regard. They would not tell the insurance carriers, please give them the information. The insurance carriers wouldn't do it because they were subject to the restrictions of the court order. So they couldn't talk to Segal. So Segal asked the insurance companies for the information and they didn't give it to them? They said we can't give it to you. We can't even talk to you. What? They said we cannot give it to you and we cannot talk to you. And you say what? The government should have told them to give it? We went to the government then and proposed a letter to the insurance companies authorizing the information to be released. The government refused to give such a letter and they didn't give such a letter until July 19, 2013. And what was the government's reason? The government never gave us any reasons for almost anything. They would ignore requests, they wouldn't deny them, just ignore them. They inferred at one point that they'd sent a letter, which they never did send. So bottom line is as we're approaching August 13th, Segal doesn't have the money because the government's in breach of those provisions, doesn't have the facts because they're not cooperated, which they're supposed to do under paragraph 19. So he asked the court for more time and the court concluded you're not entitled to more time. And the court what? The court concluded you are not entitled to more time because there's no provision in the settlement stipulation that says if the government doesn't give you the money and therefore you can't close, you get more time. In other words, the court I think thought we should have anticipated the government would breach at least two material aspects of the settlement and provide specifically if they did that, we would then get more time to perform. That to me is unreasonable for someone to presume the other side is going to materially breach. And it wasn't like the government, the court didn't know this, the court entered numerous orders on the government to release funds, all of which were ignored for months until ultimately the final funds were released on February 2014. I'm sorry, you're saying this is news to me. I'm sorry. The court ordered release of funds on specific terms that the government disregarded? The terms were... Could you be more specific? ...released the funds. An order is entered. No funds are released. There's at least three such orders. When were they issued? The... I'm sorry, just take me one second. The order with respect to the $526,000 that was being restrained as part of the restitution, the order was entered on 5-21-2013. That money was released September 27th, 2013. Then the government withheld $750,000 to try and compel Siegel to help them, help the government, work out a settlement with his ex-wife. Something not his obligation. It related to assigning the interest in two developments. Siegel assigned his interest in development in May, actually he assigned his interest as part of the... Where was the, where was what you say is disobedience of the court order? The $750,000, the court concluded on November 19th, 2013, that both Siegel and his wife should send an additional assignment and therefore the $750,000 should be released. That money was released on February 2014, not on November 19th, 2013. Another example of an order being ignored by the government. If we fast forward to the Bulls, the exercise of the to think that. Let me ask you, the insurance provision in the stipulation settlement, it says that the way Siegel would exercise his option was by sending a letter. Not paying money, just sending a letter. So why did he send the letter by August 13th? Because the rest of the paragraph said within 10 days of sending the letter you will send the money. He knew he couldn't send the money within 10 days of sending the letter. Well why didn't he send the letter invoking the option and say, you know, by the way I don't, I'm not able to come up with the money within 10 days. Well he asked the court for more time to do that and he asked the court... Why didn't he send the letter? He didn't think it would be effective, he didn't think it would solve the problem. That's not a, that is not a good reason. It says if you want to exercise the option you send a letter by August 13th. That's the simplest thing in the world to send a letter. And then you can explain in the letter I can't, I can't comply with the 10-day payment requirement and I have the following reasons and so on. But you would have invoked your option. I agree that sending the letter would have invoked the option. We thought the more prudent... Well I don't understand why he didn't send the letter. We thought the more prudent approach... No, you were wrong because it says the way you would, the way you exercise the option is send a letter. So you should have sent a letter. Then if we send the letter we still would have had to go in on a motion. Look, that's speculating. We don't know what would have happened if you'd sent a letter because you didn't send a letter. I agree, but the speculation is based on the complete lack of performance by the government almost on every aspect of this. Yeah, but you made a big mistake. We didn't think it was a big mistake. Well it was a big mistake. But if I could just deal with what we did do. We filed the motion before the exercise date of the option, asked the court to give us more time. The government then informed the court we thought we could work this out and get more time. So the government then, I'm sorry, the court then did not see the urgency of addressing the motion for more time. After the due date passed, the government changed its mind, said well we can't work it out. Too bad you lose, we're going to sell the policies. So we asked the court to enter an order denying our motion for more time so we could take an appeal and the court did and we appealed that. Now if I could forward, fast-forward to the Bulls appeal, the Bulls option. Siegel settled part of his forfeiture by assigning one-half of his interest in three Bulls partnerships to the government. He retained as part of the settlement stipulation the option to repurchase those interests and he also retained, I'm sorry, and the government retained the right to try and sell those interests in a commercially reasonable cash sale. If the government could do so, Siegel had the right to meet that offer and to exercise the right of first refusal. Siegel had exercised his option by the 6th of August. He did so on the 2nd of August. The government then came in about a week later and said we have a buyer for your interest and we think it's a commercially reasonable purchase. We looked at the purchase and concluded it was not commercially reasonable and asked the court to conclude it wasn't and the principal reason was the offer itself said this is an expression of intent, this is not an offer to purchase. Then we pointed to other aspects of the proposal where the offeror was not bound to do so. The court also concluded no, that's a commercially reasonable offer even though the buyer is not obligated to buy or close or do anything. We also appealed that and there's where we had a problem. The court concluded it was commercially reasonable, did not enter an order, refused our request for protective order, not enter an order. Finally, we asked the court to enter an order date which would have barred Siegel from appealing. We appealed that and we sought a pro bono ondamus on that. The government acknowledged no ondamus necessary. Our appeal was timely. Mr. Joyce, could I ask you on the Bulls issue, how far do you think the U.S. had to have gone with its potential buyer in terms of getting approval from the Bulls and the NBA before there would be a commercially reasonable offer? I'm not sure they had to go get the approval of the Bulls or the NBA, but they had to come up with a cash offer. I will pay this much cash for these interests. Well, there was a dollar amount, but there were a lot of contingencies. So I'm asking you, apart from the definitive agreement, those reservations, what about the permission needed, the Bulls and the NBA? No consents were needed because the only thing the government could sell was an economic interest in the partnerships. They could not sell the right to be a partner. Under Illinois law, under the partnership documents, no partner had the right to convey the right to be a partner. The most you could do is convey your economic interests. So the government only had that to sell. Any purchaser could have said, I'll buy that, but he didn't. Could I ask you about the Rush Oak stock? Yes, I wish you would. Looking at paragraph eight of your settlement agreement. Eight of the? Settlement agreement. Okay. In essence, my question, isn't it obvious that under paragraph eight, Exhibit A had a mistake because the Rush Oak stock was never listed on Exhibit A? Under paragraph eight, Exhibit A is supposed to identify all of the property that the government had restrained. All the property the government claimed an interest in? Yes. That it restrained? Yeah. The government could not claim an interest in the stock Siegel had owned personally since 1970. The government typically claimed an interest in stock Siegel purchased while at near north. So the government acknowledged they got paid their 15 million dollars. Is it correct, Mr. Joyce, that the stock had been subject to a restraining order from the court? Absolutely. Every asset Siegel owned was. Okay, so why isn't it covered by paragraph eight? The way we dealt with paragraph eight, let me say we, I mean the government and Siegel, was that you would list in paragraph, in Exhibit A, the assets that were restrained that you claimed an interest in. We would list in Exhibit B the assets that were being given up to Siegel. At the end of that exercise. I don't see anything in paragraph eight about a claim of interest. I see it is agreed that pursuant to various orders entered by this court, property, including proceeds from sale of assets, etc., are either in the custody of the United States Marshal or the court-appointed trustee or restrained by the property custodians. That description includes the Rush Oak stock, correct? That description does, but it was never listed. And it then says the property is identified and described more fully on Exhibit A, and Exhibit A did not identify the Rush Oak stock. That is correct. So why is that not obviously a mutual mistake with respect to the contents of Exhibit A? Because we negotiated the contents of Exhibit A and Exhibit B, and there was never any negotiation to include Rush Oak Corporation. So if there was a mistake, it was a unilateral mistake. Reconcile the fact that Rush Oak stock was enjoined under control of the government and not listed on Exhibit A with the text of paragraph eight, please. I have a hard time doing that, except I know that the negotiations were about what assets would be listed on A and B. Well, I understand negotiating what would be listed on B. That's what he gets to keep. I don't understand how you could negotiate A's contents, since it's supposed to be everything the government has. The government didn't have it. It was restrained, you're correct in that regard. Close enough, that's what I mean. I can't explain that, was never brought up, was never a position raised by the government on paragraph A. Their reliance was, they said they made their own mistake in preparing Exhibit A. Well, they got paid the 15 million dollars. The stock in question always was Siegel stock. They didn't need it to pay the 15. They never claimed they needed it. They just wanted it. Okay, thank you, Mr. Joyce. Mr. Hogan. May it please the Court, William Hogan on behalf of the United States. Your Honor, we're here today, as we've already heard, to talk about three aspects of the settlement agreement, which was the result of a great deal of negotiation between the parties following two appeals to this court and two remands to the district court. The latter of which, the last of which, in 2011 resulted in a potential forfeiture trial, in which approximately 47 million dollars, which had been restrained by the government, was to be determined as to title initially. Then, after that, assuming that Mr. Siegel owned any of that property, evaluation of what he owned was to be determined in the second portion of a bifurcated forfeiture proceeding. If he was determined to have owned less than 15 million dollars, which was his forfeiture amount, the government would keep all of it. If he were to be determined to own more than 15 million dollars, the government would get the 15 million dollars by liquidation of whatever assets were available, and he would get the overage or the difference afterwards. The settlement agreement was reached in February, early February of 2013, and almost immediately fell apart. It resulted in extensive litigation from the beginning of March, all the way through a hearing that took place before the district court in November of 2013, on November 13th. In that interim period, there were probably at least 10, perhaps 15, different appearances before the district court on various different aspects of the agreement. It was contested primarily by the defendant on various grounds, starting almost from day one. We're here today to talk about three particular aspects of that. That is the insurance differential, or the insurance option, the option to purchase the Chicago Bulls, and the Rush Oak bank stock. And let's start with the insurance. As the court's already heard, Mr. Siegel had a option to purchase... Mr. Hogan, why does the government care? If Mr. Siegel is ready to pay the cash value, could you expect to get any more for those, or are you waiting for him to die? Well, the answer is no, we can't expect to get any more for him to die. So why are we having this debate? We're having a debate because there were three different disputes here, actually more than three, but it boiled down and got resolved. Several of them, there was another one that was resolved. It's not at issuing these appeals, $750,000 on the Sheridan House, because all of those together were tied together in the insurance. Is this a hostage? I mean, what are we doing with the insurance policy? It's part of the overall bargaining that we tried to resolve. As I explained to the district court, we had numerous, for many, many months, settlement negotiations. But Judge Halder is just asking, what is the fiscal significance for the government? The insurance has diminished over the period of time in that the premiums are being paid by the money that has already been paid to the insurance companies many years ago by Near North, which has always owned these policies, so that if today the policies were to be sold, they're worth less money for insurance value, for cash surrender value, for example. They're not worth the $2.1 million that they were a year and a half ago, two years ago. But wasn't the amount of the option specified? No. The option provided that he could purchase six insurance policies for their cash surrender value at the date the option was exercised. And contrary to what Mr. Joyce argued to you, the provisions in that option were that at the time the option was exercised, the government then had 30 days to determine what the cash surrender value was. After Mr. Siegel wrote the letter that you've already alluded to, Judge Posner, he didn't have to pay any money. The government then had 30 days to contact the insurance companies, get the cash surrender value, give it to him, and then he had an additional 15 days to decide whether or not he wanted to purchase one or more of those policies. So a total of 45 days past the August 13th option exercise drop-dead date. What happened was he just totally blew the option date. He didn't address it at all during the month of August 2013, at all. He didn't raise it again until September 4th when he went before Judge Castillo and asked Judge Castillo to revitalize a motion to extend the period of time to purchase those policies. And Judge Castillo's response to that was, I don't think I have the authority to do that under the settlement agreement. I don't remember it clearly as I sit here, but if you are going to ask me to do that, you have to file a brand new motion from scratch. And he said, and I emphasize from scratch, what is my jurisdiction? In response to that, Mr. Joyce on Mr. Siegel's behalf filed a motion on October 10th of that year, again asking for an extension of time to litigate the insurance option. Again, for the reasons that he has explained here, the lack of cooperation, lack of money, and things like that. Well, that came to a hearing in November and Judge Castillo rejected all the defendant's positions on that. He found that there was no authority for an extension of time. And more importantly, contrary to what Mr. Joyce has argued for you here today, he found that there was no breach by the government of either of the provisions for cooperation in General Paragraph 19 of the agreement, nor of the provision regarding furnishing information to Mr. Siegel from the insurance companies. In fact, what he found to the contrary was, after having reviewed all the information that was submitted by the government, was that the government had complied with its significance of the last sentence in Paragraph 90. If the option is not exercised or the funds are not received as required, the government shall liquidate the policy or policies. That gives the government the right to, as it says very plainly, liquidate the policies and keep the money for payment to creditors. And one of the things that might be overlooked here... Wait, I'm sorry, I didn't hear you. Creditors of the company. Okay, so has that been done? No, because of this ongoing litigation, we have prudently held off because we were, you know, concerned to some extent about what the outcome might be. And if we liquidate $2 million worth of policies, it's not something that we can then go back and repurchase. But the answer to my earlier question is that the value of those policies has been diminishing because of premiums. Okay, I hadn't realized that. Yes, for the last several years. So, in effect, Mr. Siegel blew the insurance date, as Judge Castillo clearly found. And that was not a clearly erroneous finding. He also found, as I've already alluded to, specifically that the government, and he says this specifically in his findings, I've carefully reviewed everything that was submitted by the government, the emails, the documents that were provided, and I found that the government did not, in fact, breach its obligations for cooperation. What the government, in fact, did was go well beyond its obligation, which was only to furnish the cash surrender value information. And we did, in fact, contact the insurance companies. We sent, contrary to what Mr. Joyce has argued here today, a letter to the defendant in April of 2013, shortly after the settlement agreement was reached, suggesting that there be mutual cooperation in approaching the insurance companies to provide information that Mr. Siegel wanted. That letter went unresponded to. It's clearly marked as a draft. The caption of the letter is, to the relevant insurance companies. It went to the defendant. It was not commented upon until late June of that year. It wasn't until late July that they came back with a proposed different letter that did, in fact, go to the insurance companies in July of that year. As Mr. Joyce noted, Hartford, one of the insurance companies, responded within a week, well over two weeks before the expiration of the option period. The other insurance company responded with approximately 50 pages of materials, which I've submitted to this court as a government supplemental appendix, that has all of the information requested by Siegel. That information was returned within the 30-day period following the expiration of the option in which the government had to furnish just the surrender value, not any other additional information. So Mr. Siegel had, long before he ever had to make any decisions about paying any money to the government for these policies, all the information that he could have possibly wanted. All he had to do was write a simple letter in August, and he didn't do it. The reason he didn't do it, among other things, is that because he got off on a sidetrack regarding the Chicago Bulls option, which was also to expire the same day, that is August 13th. Shortly before that, now the provisions for the Chicago Bulls option have slightly different timing. What it says is that Mr. Siegel has the right to exercise his option shortly before August 13th if he wants to, if the government doesn't have a higher offer. What Mr. Siegel did was write a letter to the government on August 2nd of that year. Can I just ask you, before you dive into the details of the Bulls, I just want to nail down something on the insurance policy. Yes. The way this was structured was exercise the option by sending a letter, no cash. Correct. Government can then provide cash value, and you're saying all of the additional information was provided. It was. Within those 30 days. And if at that point Mr. Siegel sees that information and says, this is not as good a deal as I had hoped, I'm not going to send the cash, there are no consequences for him, you keep the policies. That doesn't mean he's got the cash. That's a separate issue. That's exactly right. That takes care of the information. And those dates are the 13th of August and then to the 12th of September for the government to provide the cash value, and then to September 27th for Mr. Siegel to, if he chooses to, actually pay for the policies. If you want to go back to the Bulls, fine. Thank you for the explanation. With respect to the Bulls, Your Honor, Mr. Siegel wrote a letter on August 2nd saying that he intended to exercise his option to purchase the Bulls for approximately $2.1 million. In that letter he specifically said, I will pay you by August 16th. The provisions of the settlement agreement, however, provide that 10 days from the exercise of the option, the money is due. That is August 12th. On August 8th, Mr. Siegel wrote to the government and said, I need more time, I don't have the money, I want you to grant me an extension of two weeks from August 16th to August 30th to come up with the money. On August 9th, the government wrote back and said, no, we're not going to grant that extension. What was the reason for that? The reason for that, Your Honor, was that we had been in negotiations with a higher offeror. In fact, August 9th was a Friday. On Monday, August 12th, we solidified the contract for the higher offer for an extra $900,000, and we furnished it to Mr. Siegel that day, timely, the day before the expiration of the option period. We told him we had a higher offer. On August 12th, Mr. Siegel's time to pay the $2.1 million ran out. He didn't pay it. What he did that day was spend all day writing two emergency motions to try and stop the bulls transaction that we had furnished him the information on, on August 12th. On August 13th, he filed two emergency motions to try and stop the bulls transaction. He did nothing at all about the insurance, which expired that day, not a word about it in either of his motions. One of the motions was to clarify the dates regarding the bulls. The other one was essentially what he characterized as a protective order to try and stop the transaction and ask the district court to clarify whether or not the proposal, the contract that the government had, in fact, received, met the terms of a commercially reasonable cash offer as required by the settlement agreement itself. We appeared in court on August 14th, no mention by Mr. Siegel's counsel of the insurance at all. Instead, what he did, Mr. Siegel's counsel asked the district court to determine whether or not the contract which had been provided to Mr. Siegel the night before, or two days before, met the terms of a commercially reasonable cash offer. Judge Castillo said, I will consider that. Come back and see me on the 21st. Mr. Siegel's counsel did not say, wait a minute, I have an offer out here on the bulls that actually expired two days ago because I didn't make the payment, even though I thought I was entitled to make the payment on the 16th. Judge Castillo, my deadline for making the payment, in my mind, is two days from now. Can you please decide tomorrow or can we come back here on the 16th so I still have time to make the payment if you decide that this other contract is not commercially reasonable? He said nothing at all. In fact, went on his merry way and came back on the 21st. On the 21st, Judge Castillo, in response to both a brief that was submitted on the 13th, this emergency motion, and another brief that was submitted on the 20th, recounting all these alleged difficulties in the contract that Mr. Siegel perceived, rejected them all as a matter of fact finding. He said that the ostensible difficulty in due diligence, for example, was not something that just gave the purchaser the right to unilaterally walk away. Mr. Siegel raised a number of different things that are spelled out in his brief at great length. They're addressed in our brief. Could you focus on the paragraph requiring a definitive agreement? A definitive what? Definitive agreement that can include such other provisions as the parties in their sole discretion require. In the agreement itself, Your Honor? In the offer. Yes. The offer to purchase of date at August 12th. The offer to purchase that date, there are a number of factors in there. I think that there are six, if I recall the paragraph that you're referring to, there are six different conditions that give the offeror an option to terminate the agreement. They are, in Judge Castillo's fact finding, not unusual, quote, unquote, was the word that he used. They do not give the offeror the option to simply walk away. I understand the position, but I have a difficult time reconciling that conclusion with the text of the requirement of coming up with a definitive agreement as to which this memorandum leaves both sides with complete sole discretion as to what its terms may be. I understand. Well, it's necessary, I think, under those circumstances, Your Honor, for the party, for the offeror to conduct some due diligence. That's a separate requirement. Okay. I'm talking about the definitive agreement, and all of us are familiar with cases in which parties agree on material terms and there are limits on the discretion regarding a definitive agreement. This is drafted in such a way as to reserve, it looks to me, complete discretion to walk away on both sides. Well, that is the argument that was made to Judge Castillo that he rejected as a fact matter, Your Honor. Well, explain to me, given the text, why that's correct, or at least not clearly erroneous. Because there are conditions in there, as Judge Castillo found, that allowed the trustee acting on behalf of the government to, if that determination by the purchaser to walk away was unreasonable, give him the opportunity to contest that in litigation. You're telling me the conclusion. One of the things the offer is contingent on is satisfactory, is the negotiation and execution of a definitive agreement acceptable to purchaser in accordance with the section of this offer entitled definitive agreement. Correct. We turn to that paragraph and we see it's supposed to conform to the terms of this offer, customary covenants. That's the kind of thing where there's room for somebody to say, no, you're being unreasonable. Right. And then we have, and such other provisions as the parties and their sole discretion require. I think that that's a normal contract term that leaves it available to contingencies that might arise. What does the word definitive mean? A final signed contract after due diligence has been conducted. That's my interpretation. Judge Castillo found that that was a reasonably commercial term. In a contract that he found factually was reasonably commercial. Well, it's perfectly reasonable for parties to include that kind of term. But the question is, given the war these parties have been in for the last decade or so, I have trouble seeing how that is an offer of cash on the table when the buyer seems to be reserving the right to walk away. That, in his sole discretion. Your Honor, I understand your question. I don't have an answer other than the one that Judge Castillo reached, which we believe is not clear. I won't beat a dead horse. More importantly, however, if I could to that point, that decision by the court in 2013 was not appealed. Where is it reflected in the court's judgments? The court issued a minute or, well, first of all, it said it orally that day on the 21st of August. And in its minute order of the same day, it ruled on one of the two emergency motions that had been filed on the 13th. That is the motion to clarify the time. That's, I think, docket number 1763. Docket 1765 is the one that Mr. Joyce is complaining about in his brief. That was, Your Honor, the one that claimed that it wasn't a reasonable offer at all and that Judge Castillo should reject it. However, once again, that motion wasn't filed until August 14th. Mr. Siegel's option expired August 12th. His obligation to make a payment expired August 12th. That motion was filed out of time. Mr. Siegel has made it plain over and over throughout these proceedings. Did the district judge take that approach? No. Okay. That is in our brief, however, in terms of the timing that's pointed out in the agreement. Okay. I'm looking at the minute order for August 21st, and I don't see the conclusion you're saying should have been appealed reflected in that. I don't even see a reference. I just don't see it. Well, that motion asks him basically to determine whether or not it's a reasonable cash offer. Right. And concurrently or concomitantly, then would presumably give Siegel the right to match it. Siegel has maintained all the way through these proceedings that he never had intention to match it. His lawyer stood up in front of Judge Castillo and said it. He says it in these briefs. He never wanted to match the higher offer. All he wanted to do was, quote, exercise his option. His time for paying for that option expired before he ever filed a motion. It expired on the 12th. Okay. Thank you very much, Mr. Hogan. Time has expired. Mr. Joyce, do you have any further comments? I'll be very brief. I know Judge Hamilton seemed concerned about the fact that the cash surrender value was diminishing as time went by. When Siegel proposed he needed more time, the written proposal said that we will reimburse you for any diminution in the cash surrender value in the event we not exercise the option. So the government had no risk at all of giving more time. The government pointed out a minute ago that Siegel did not raise the issue of the insurance option in August 2013. No, he had done so already in July 2013, and it had been continued because the government said we're going to work this out. The government mentioned a minute ago there was a letter prepared on April 13, 2013 directed to the insurance companies to get Siegel more information. When you read the letter in the file, you'll conclude the letter infers it was sent. It was never sent. It's not marked draft. Okay. Thank you very much. So thank you very much to both counselors.